

| | |
|---|---|
| SALVATORE DePIANO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 07 C 1407 |
| | ) |
| MICHAEL J. ASTRUE, | ) Judge Ruben Castillo |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant, | ) |

## MEMORANDUM OPINION AND ORDER

Salvatore DePiano ("Plaintiff") seeks judicial review of the final decision of the

Commissioner of the Social Security Administration ("SSA") denying his application for

disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C.

§ 405(g). Before the Court are the parties' cross-motions for summary judgment. (R. 13, Pl.'s

Mot. for Summ. J.; R. 19, Def.'s Mem. in Supp. of Mot. for Summ. J.) For the reasons stated

below, the Commissioner's motion is denied, and the Plaintiff's motion is granted.

### RELEVANT FACTS

Plaintiff was born on June 11, 1948, and is a resident of Melrose Park, Illinois. (A.R. at

51-52.)[1] He attended school for eight years in Italy and served in the Italian military. (A.R. at

247-48.) He can speak English, but can read and write only a little English. (A.R. at 248.) He

has past work experience as a janitor, bus driver and security guard. (A.R. at 124-31, 249-50.)

---

[1] Citations to (R. ___) refer to the record number that a document is assigned on the docket sheet for this case. Citations to (A.R. ___) refer to the administrative record of these proceedings, which was filed as entry number 11 on the docket.

Plaintiff applied for disability insurance benefits on November 10, 2004, claiming a disability onset date of February 16, 1994. (A.R. at 52-54.) Because his insured status expired in September 2000, he was required to establish disability by that date in order to obtain disability benefits.[2] (A.R. at 31, 114.)

## I.    Medical Evidence

Plaintiff alleges that he suffers from low back pain, numbness of the lower legs, left hip pain, and right shoulder pain. (A.R. at 31.) Plaintiff's medical problems began on March 5, 1991, when he fell on some stairs at work and landed on his back and right shoulder. (A.R. at 177.) A magnetic resonance imaging ("MRI") of Plaintiff's lumbar spine done on March 15, 1991, showed a mild, broad-based bulge of the L4-5 disc, but no findings suggesting herniation. (A.R. at 167.) The alignment of the spine appeared normal. There were moderate changes of facet joint arthritis at the L3-4 and L4-5 levels, and mild to moderate osteophytic encroachment upon the L4-5 neural foramina, related to hypertrophic changes. (A.R. at 167.)

On February 16, 1994, Plaintiff suffered another accident at work when he tripped over a portable stairway. (A.R. at 176, 190, 200.) Plaintiff visited Dr. Simov, his treating physician, on February 18, 1994, and she noted restricted range of motion in the right shoulder but no obvious signs of fracture. (A.R. at 190, 200.) Dr. Simov diagnosed Plaintiff with right shoulder sprain,

---

[2] To obtain disability insurance benefits, a claimant must have disability insured status, which is determined on the basis of earnings records. The date of expiration of insured status is referred to as the "date last insured." The claimant must establish that a disability as of the date last insured in order to obtain benefits. *See* 20 CFR § 404.130; *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997). In this case, Plaintiff's insured status expired September 30, 2000. (A.R. at 31.)

as well as spinal stenosis,[3] lumbosacral sprain, and contusions of the lower leg. Among other findings, Dr. Simov noted that there was "tremendous paraspinal spasm of the LS & Thoracic part of back." (A.R. at 190.)

Dr. Simov's progress notes on February 28, 1994, and March 17, 1994, indicate that Plaintiff reported his leg felt better. (A.R. at 199, 202.) However, he continued to complain of lower back pain, which he said restricted his movements and affected his ability to ambulate fully. (A.R. at 199.) Because Plaintiff was still experiencing transient spasms in his back, Dr. Simov recommended physical therapy. (A.R. at 202.)

From March 22, 1994, through May 18, 1994, Plaintiff participated in physical therapy, and on April 6, 1994, he reported that he felt some progress with his range of motion. (A.R. at 194-98.) On April 22, 1994, Plaintiff complained of right hand pain with numbness and weak grip. (A.R. at 201.) Dr. Simov also noted pain and restricted range of motion in Plaintiff's lower back. (*Id.*) Progress notes on May 5, 1994, indicated that Plaintiff was improving. (*Id.*) On May 18, 1994, notes from the physical therapist indicate Plaintiff reported no shoulder pain but continued lumbar back pain. (A.R. at 198.)

On May 23, 1994, Dr. Simov reported that Plaintiff had continuation of pain, easy tiring of lower legs, weak right hand grip, restricted range of motion of the lumbar spine, and positive

---

[3] Spinal stenosis is the abnormal narrowing of the vertebral canal, nerve root canals, or intervertebral foramina of the lumbar spine, caused by encroachment of bone upon the space. *Dorland's Medical Dictionary* at 1698 (29th ed. 2000). The Court notes that many of the medical terms appearing in the record were not defined by the parties. Where possible, the Court has provided definitions of the relevant terms.

3

straight leg raising.[4] (A.R. at 204.) Dr. Simov recommended a computed tomography ("CT") scan of Plaintiff's back. (*Id.*) The test was performed on June 1, 1994, and the findings included L4-5 mild disc bulging, L5-S1 mild disc bulging, and relative mild spinal stenosis at L3-4 and L4-5. (A.R. at 181.)

On June 6, 1994, Plaintiff reported feeling unsteady and having fallen to the floor. (A.R. at 204.) His left hand and index finger were swollen. (*Id.*) On June 20, 1994, Plaintiff reported a lack of energy, decreased mobility of his left leg, and numbness in his right thumb. (*Id.*) Dr. Simov's exam revealed positive straight leg testing. (*Id.*) Her notes from August 22, 1994 to November 14, 1994, indicate Plaintiff continued to complain about stiffness, pain, and an inability to stand or assume any body position for longer than 10 minutes. (A.R. at 205.) Dr. Simov performed more positive straight leg tests during this period. (A.R. at 206.)

On November 15, 1994, in a letter to the Illinois Municipal Retirement Fund, Dr. Simov reported that Plaintiff's back problems were expected to worsen. (A.R. at 193.) She stated, "Mr. DePiano has persistent medical problems of the lower spine which to the best of my medical knowledge and all the consultants he has been to with this disability time is not going to alleviate but is expected to get aggravated and worsen." (*Id.*) She noted, however, that Plaintiff "will be capable of returning back to work on a position equivalent to supervising or advising at the same level job he has had before." (*Id.*)

---

[4] Straight leg raising is a neurological examination of the lower extremities that will detect the small deficits produced by disc disease. A positive straight leg test indicates nerve root irritation. The examiner performs the test on the supine patient by passively raising the patient's legs. The test is positive if radicular pain is produced with the leg raised 60 degrees or less. *Current Medical Diagnosis and Treatment* at 797 (38th ed. 1999).

4

On March 3, 1995, Plaintiff reported to Dr. Simov that he was able to do his job with periodic stretching and changing of body position. (A.R. at 210.) However, he also told Dr. Simov that he was unable to work a forty-hour week due to lack of stability. (*Id.*) Her examination revealed restricted range of motion to 60-70 degrees on bending, and tenderness of the left leg, which was significant for spinal nerve root compression. (A.R. at 210.) Her notes of May 2, 1995, indicate that Plaintiff reported being unable to do his job because of constant pain in the lumbar spine. (A.R. at 209.) Her notes of November 18, 1995, indicate that Plaintiff reported persistent pain of the back and shoulder, and stated that he could not do his stretching exercises due to pain. (A.R. at 217.) Treatment notes of June 3, 1996, indicated pain in the right shoulder due to bursitis, with restricted range of motion, and numbness of the lower legs. (A.R. at 212.) Treatment notes of August 9, 1996, indicated that Plaintiff complained of pain and numbness of the back, left leg numbness, and right thigh pain after being on his feet. (A.R. 213.)

Dr. Simov's notes of April 1997 indicate that Plaintiff reported sudden increased pain on the right side of his lower back. (A.R. at 219.) He reported that sitting created cramping and pain, and standing created pain which was compatible with stenosis. (A.R. at 219.) Her examination revealed paraspinal muscle spasm in the lumbar spine area, with decreased reflexes of the right leg, and straight leg raising pain at 60 degrees. (A.R. at 219.) Dr. Simov's examination notes of December 9, 1999, indicated back pain on bending and visible sensory findings. Plaintiff reported that his back pain was almost constant and that he could not do any work. (A.R. at 220.) Treatment notes of July 27, 2000, indicated restricted range of motion in the lumbar spine. (A.R. at 221.) Treatment notes of July 30, 2001, noted pain with restricted

range of motion, muscle tightness, and sensory neuropathy.[5] (R. at 222.)

Dr. Simov's notes of December 16, 2001, summarized Plaintiff's 1991 work injury, and noted that since that time Plaintiff suffered constant problems with his arms and spine. (A.R. at 227.) Her treatment notes of October 31, 2002, indicated that Plaintiff had pain of the lower back and an inability to maintain body positions due to pain, as well sensory and vascular neuropathy. (A.R. at 223.) Her treatment notes of December 11, 2003, indicated restricted range of motion in the right shoulder, sensory neuropathy secondary to lumbar spine, and lumbar spine disc pathology with pain. (A.R. at 224). Dr. Simov advised Plaintiff to be careful walking. (Id.) Treatment notes of March 9, 2004, indicated that Plaintiff had been unable to get up, sit, or walk for approximately one week due to low back and right shoulder pain. (A.R. at 225.) Dr. Simov found restricted range of motion in Plaintiff's extremities, secondary to weakness and pain on pressure points in the lumbar spine area. (A.R. at 225.) She diagnosed him with advanced disc disease, spinal stenosis, and sciatica.[6] (Id.)

On April 2, 2004, Plaintiff was in a car accident. (A.R. at 178.) He suffered loss of consciousness and was treated at the emergency room of Gottlieb Hospital. (Id.) On April 9, 2004, he presented to Dr. Simov with a headache, muscle aches, hip pain, and back pain. (A.R. at 178.) Dr. Simov's treatment notes of January 3, 2005, indicated that Plaintiff had restricted range of motion in the back, muscle spasm and palpable muscle bundle compatible with nerve

---

[5] Neuropathy is a functional disturbance or pathological change in the peripheral nervous system. *Dorland's Medical Dictionary* at 1212.

[6] Sciatica is a syndrome characterized by pain radiating from the back into the buttock into the lower extremity along its posterior or lateral aspect, most commonly caused by protrusion of a low lumbar intervertebral disk. *Dorland's Medical Dictionary* at 1609.

6

root compression and myalgia.[7] (A.R. at 229.)

On January 4, 2005, Dr. Simov provided an oral medical summary of Plaintiff's medical problems at the request of the Bureau of Disability Determination Services. (A.R. 183.) Dr. Simov reported that Plaintiff had a diagnosis of advanced disc disease lumbar/sacral area, chronic left sciatica, right shoulder adhesive bursitis, arthritic changes, left leg pulse anterior compartment syndrome, neuropathy, diabetes mellitus, spinal stenosis, stress related memory loss, and dementia. (A.R. at 182-83.) She reported that Plaintiff was not able to sustain physical activity longer than 15-20 minutes due to his impairments. He was not able to concentrate longer than 10 minutes and had no short-term recall. He relied heavily on his family for care, required an assistive device for ambulation and balance, and had been treated for a history of falls. His lifting and carrying were restricted to no more than one to two pounds frequently, and occasionally five pounds. His hand strength was 3/5 bilaterally, and grips bilaterally were weak. He had frequent and persistent difficulty with fine and gross manipulation bilaterally. He was not able to hold a pencil or pen and frequently dropped objects. He was not able to sit longer than 10 minutes without frequent positional changes. He was not able to stand or walk longer than 30 minutes. He was not able to maintain pace or persistence of activity. (A.R. at 183.) Dr. Simov reported that the last lumbar x-ray showed lumbar stenosis with L3-L4 disc bulging and S1-S2 disc narrowing. *Id.* She reported that Plaintiff had frequent epidural injections, along with physical and occupational therapy. *Id.*

---

[7] Myalgia is defined as pain in the muscle or muscles. *Dorland's Medical Dictionary* at 1162.

7

On July 17, 2006, Dr. Simov confirmed the summary of her January 4, 2005, statement and also noted that the "medical statement and conditions as described above has been same in year of 2000 and medically expected to worsen." (A.R. at 232.)

## II. The ALJ Hearing

The SSA denied Plaintiff's application for benefits and his request for reconsideration. Plaintiff thereafter requested an evidentiary hearing before an Administrative Law Judge ("ALJ"). (A.R. at 25-31, 33-6, 40.)

On July 19, 2006, Plaintiff appeared with his counsel and testified at a hearing before ALJ Janice Bruning in Oak Brook, Illinois. (A.R. at 244-270.) The ALJ began the hearing by explaining that Plaintiff needed to establish that he was disabled on or before September 2000, the expiration of his insured status. (A.R. at 246.) The ALJ instructed Plaintiff to answer questions about his pain, medication and medical history as of six years ago. (A.R. at 250.)

Plaintiff testified that at that time he had received pain medication but he tried not to take too much because it affected his stomach. (*Id.*) He described his pain level as between a seven and nine on a scale of one to ten, with ten being the most painful. (A.R. at 251.) Plaintiff testified that moving around was difficult even when he took pain pills. (*Id.*) Plaintiff testified that he has diabetes which is under control with medication. (A.R. at 252.)

Regarding his daily activities, Plaintiff testified that as of six years ago he napped during the day because he did not sleep well at night. (A.R. at 256.) His inability to sleep was due to the fact that he could not stay in one position very long. (A.R. at 256.) He testified that he avoided sleep medication because he did not want to get hooked on it. (A.R. at 256.) He described a normal day as walking around the house until he got tired and then going back to

8

bed. He would often fall asleep on the couch, watch some television, and then go back to bed after taking his night medication for his shoulder. He would awake at around 3:00 a.m., and would go outside once it was daylight. (A.R. at 261-62.) He was able to dress himself although his wife would lay his clothes out for him, and he had difficulty putting on his socks and pants. (A.R. at 256, 262.) His wife also prepared his medications because he would otherwise forget to take them. (A.R. at 264.) He had difficulty taking a bath by himself since he needed help getting out of the tub. (A.R. at 256.) If his wife was not at home to help him, he would sit on a plastic chair in the shower. (Id.)

He did not do any housework, laundry or cleaning, although he acknowledged doing little housework before his injuries occurred. (A.R. at 258.) As of six years ago he occasionally took out small garbage bags weighing no more than 10 pounds. (A.R. at 259.) Sometimes he would water the grass or try to pull a weed. (A.R. at 259.) He had a small dog that his wife took care of. (A.R. at 260.) He went to church "once in a blue while" but could not sit through an entire mass due to pain. (A.R. at 261.) Most of his time was spent at home but occasionally he would drive to the shopping center near his home. (R. at 257.) He could not drive further than five or six blocks. (Id.) His daughter drove him to the hearing because he could not drive longer than five minutes before his back began aching and his legs got numb. (A.R. at 264-65.) He reported that he had quit a part-time job as a security guard in 1995 because the 30-35 minute drive was too long, and his back would hurt so bad that he would start to lose control of the car. (A.R. at 265-66.)

Regarding his limitations, Plaintiff testified that six years ago he could walk for about ten minutes and sit and stand for about five to ten minutes before he had to move around. (A.R. at

9

252.) At this point in the hearing, Plaintiff asked if he could get up and move around, and the ALJ permitted him to do so. (A.R. at 252.) Plaintiff testified that he could carry a gallon of milk in his hands but could not lift it because of his right shoulder. (A.R. at 253.) He had difficulty climbing stairs, bending, stooping, crouching, crawling, and kneeling. (A.R. at 253-54.) Plaintiff testified that when he was inside his house he walked close to furniture to help his stability. (A.R. at 254.) He walked with a cane when outside. (*Id.*) He testified that he had difficulty using his hands and had pain in his right hand. (A.R. at 254.) He has never had surgery for his shoulder or back. (A.R. at 255.)

The vocational expert, James Breen ("Breen"), testified that Plaintiff's past relevant work history as a janitor was unskilled and heavy, and his work as a school bus driver was semi-skilled in the medium category. (A.R. at 267.) The ALJ asked Breen to consider a hypothetical individual of Plaintiff's age, education, work experience who could lift 10 pounds frequently and 20 pounds occasionally; stand/walk at least 6 hours during an 8-hour workday; sit 6 hours in an 8-hour workday with a sit-stand option at will; and occasionally climb, balance, stoop, crouch, kneel, and crawl. (A.R. at 267.) Breen testified that such a person could not perform Plaintiff's past relevant work, but could perform certain unskilled light jobs including fast food worker, cashier, and housekeeping. (A.R. at 268.) The ALJ asked whether a person could perform those jobs if they could reach overhead only occasionally with their right arm. (A.R. at 268.) Breen responded that such a person could not perform housekeeping work, but could still perform the other two jobs. (*Id.*) Plaintiff's attorney then asked Breen whether a person could perform those jobs if he had difficulty standing for more than 10 or 15 minutes at a time without needing a rest. (*Id.*) Breen responded that such a limitation would rule out both jobs. (*Id.*) Plaintiff's attorney

10

then asked Breen if a person who has to lie down during the day could qualify for such positions, and Breen testified that such an individual would be precluded from "those jobs and any other jobs." (A.R. at 269.)

## III. The ALJ's Decision

Following the hearing, the ALJ issued a written opinion denying Plaintiff benefits, finding that he was not disabled as of his date last insured. (A.R. at 17-23.) The ALJ determined that Plaintiff had not engaged in substantial gainful activity since February 1994. (A.R. at 19.) The ALJ next determined that Plaintiff had one severe impairment, "mild disc bulging," but that Plaintiff's other impairments, including his diabetes and right hand impairments, were "not severe since individually or combined they do not impose more than a minimal limitation on the claimant's ability to perform work-related activities." (A.R. at 19.) The ALJ further concluded that Plaintiff's impairments do not "meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." (A.R. at 20.)

The ALJ then assessed Plaintiff's residual functional capacity to perform work in the national economy. (A.R. at 20.) The ALJ concluded that Plaintiff retained the residual functional capacity to lift/carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk 6 out of 8 hour workday and sit 6 out of 8 hour workday with sit-stand option at will; and climb, balance, stoop, crouch, kneel and crawl occasionally. (A.R. at 20.)

In reaching this determination, the ALJ concluded that the opinions of Dr. Simov were entitled to little or no weight. (A.R. at 20.) The ALJ considered Dr. Simov's opinion from December 2004 that Plaintiff could not sustain physical activity longer than 15 to 20 minutes, along with her diagnosis of advanced disc disease, chronic sciatica, right shoulder adhesive

11

bursitis, spinal stenosis and other impairments, but concluded: "This examination, however, was conducted in December 2004; more four years [sic] after the claimant's date last insured and therefore this opinion is given no weight." (A.R. at 20.) The ALJ also considered Dr. Simov's opinion that Plaintiff's condition was the same in 2000 and expected to worsen, but gave this opinion "no weight" because "the doctor did this on behalf of the claimant and his attorney in order to assist him in obtaining disability benefits." (A.R. at 20.) The ALJ also found Dr. Simov's opinion that Plaintiff's condition was expected to worsen internally inconsistent: "Does it mean the claimant has not gotten worse since 2000 which is inconsistent with other evidence including the doctor's own statements from 1994 indicating the claimant will worse [sic]." (A.R. at 20.)

The ALJ also determined that Plaintiff's subjective complaints of pain were not fully credible. (A.R. at 20.) She concluded that "there are no objective medical records to support [Plaintiff's] claims" of disabling pain. (A.R. at 21.) The ALJ also noted that Plaintiff was able to sit longer than 10 minutes at the hearing. (A.R. at 21.) In short, the ALJ found that Plaintiff's claimed limitations "do not find support in the medical record." (A.R. at 21.)

Based on the testimony of the vocational expert, the ALJ concluded that although Plaintiff could not return to his past relevant work, there were jobs in the national economy he could perform, including jobs as a fast food worker, cashier, and housekeeper. (A.R. at 22.) Consequently, the ALJ denied Plaintiff's application for benefits. (A.R. at 22-23.)

On January 19, 2007, the Appeals Council denied Plaintiff's request for review.[8] (A.R. at

---

[8] Because the Appeals Council denied Plaintiff's request for review, the ALJ's ruling constitutes the final decision of the Commissioner subject to judicial review. *Blakes v. Barnhart*, 331 F.3d 565, 568 (7th Cir. 2003).

5-14.) Thereafter, Plaintiff filed this action seeking judicial review of the final decision of the Commissioner denying him disability benefits. (R. 1, Compl.)

## LEGAL STANDARDS

In reviewing the ALJ's decision, this Court determines whether it is supported by substantial evidence and based on the proper legal criteria. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004); *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). "Although this standard is generous, it is not entirely uncritical." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). In reviewing the ALJ's conclusions, "[t]he court will conduct a critical review of the evidence, considering both the evidence that supports, as well as the evidence that detracts from, the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). The ALJ must explain his analysis with "enough detail and clarity to permit meaningful appellate review." *Id.* However, in reviewing the ALJ's decision, the Court cannot "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez*, 336 F.3d at 539.

## ANALYSIS

A claimant is qualified to receive Social Security disability benefits if found to be disabled within the meaning of the Act. 42 U.S.C. § 423(a)(1)(E); *Briscoe*, 425 F.3d at 351. A disability is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death

13

or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also Barnhart v. Walton*, 535 U.S. 212, 219-220 (2002).

To determine whether a claimant qualifies for disability benefits, the ALJ performs a five-step sequential analysis, deciding: (1) whether the claimant is performing substantial gainful activity; (2) whether he has a severe impairment or impairments; (3) whether his impairment or combination of impairments meets or equals a listed impairment contained in the Social Security regulations; (4) whether the claimant's impairments prevent him from doing his past relevant work; and (5) whether other work exists in significant numbers in the national economy that accommodates the claimant's residual functional capacity and vocational factors. 20 C.F.R. § 416.920; *Briscoe*, 425 F.3d at 351-52. An affirmative answer at steps one, two, or four leads to the next step, while an affirmative answer at either step three or step five requires a finding of disability. *Briscoe*, 425 F.3d at 352. A negative response at any step other than step three ends the inquiry and requires a finding that the claimant is not disabled. *Clifford*, 227 F.3d at 868. The claimant bears the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352.

Here, the ALJ's analysis at steps one, two and four are not in dispute. The ALJ found that Plaintiff has not engaged in substantial gainful activity since February 16, 1994; suffers from a severe impairment (mild disc bulging), and cannot return to his past work. (A.R. 19.)

Plaintiff argues, however, that the ALJ made erroneous rulings at steps three and five. Specifically, Plaintiff argues that at step three the ALJ failed to adequately consider whether his impairments meet or equal one of the Listing of Impairments contained in the Social Security regulations. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1. At step five, Plaintiff argues that

14

the ALJ erred in determining his residual functional capacity by improperly rejecting the opinion of his treating physician, improperly discrediting his subjective complaints of pain, and ignoring medical evidence. The Court considers each argument in turn.

## I. The ALJ's Step Three Analysis

At step three, the ALJ found that Plaintiff's condition did not meet or medically equal a listed impairment. (*Id.*) Under the Social Security regulations, a claimant is eligible for disability benefits if he has an impairment or combination of impairments which meet or equal an impairment found in the Listing of Impairments. 20 C.F.R. §§ 404.1520(d), 416.920(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1. A claimant seeking disability benefits bears the burden of proving that his condition meets or equals a listed impairment. *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999).

The Seventh Circuit has held that in conducting a step three analysis, the ALJ should mention the specific listings he is considering, and his failure to do so, if combined with a perfunctory analysis, may require a remand. *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004); *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004). Here, the ALJ's step three analysis consisted of one sentence: "The claimant does not have an impairment or a combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, and 404.1526)." (A.R. at 20.) Plaintiff argues that the ALJ improperly failed to identify the relevant listings she was considering at step three and also conducted an inadequate, perfunctory analysis. (R. 14, Pl's Mot. for Summ. J. at 11.)

Although the ALJ's analysis was conclusory, as the Commissioner points out, Plaintiff

15

has not argued that he meets a Listing, or identified which Listing he might meet. Under Seventh Circuit case law, the ALJ commits reversible error at step three if she fails to discuss a specific listing or provide a thorough analysis if there is conflicting evidence about whether the claimant meets a specific Listing. *See Ribaudo*, 458 F.3d at 583; *Rice*, 384 F.3d at 370. However, where the claimant has never claimed to meet or equal a Listing, the ALJ's perfunctory analysis at step three would not require a remand, since it is Plaintiff's burden to establish that he meets or equals a Listing. *See Scheck*, 357 F.3d at 700-01; *Steward v. Bowen*, 858 F.2d 1295, 1298-99 (7th Cir. 1988).

Because Plaintiff has not explained how he meets or equals a Listing, ordinarily a remand might not be warranted. However, for the reasons discussed below, the Court has concluded that this case must be remanded due to other errors committed by the ALJ, including her failure to adequately consider the medical evidence favorable to Plaintiff. Her failure to evaluate the medical evidence supportive of Plaintiff's claim "does not provide much assurance that [s]he adequately considered [Plaintiff's] case," *Ribaudo*, 458 F.3d at 584, and for this reason further proceedings are necessary. The Court disagrees with the Commissioner's assertion that "the record irrefutably leads to the sole conclusion that Plaintiff does not meet or equal a listed impairment," and instead we leave the matter to determination by the ALJ in the first instance. (R. 19, Def.'s Mem. in Supp. of Summ. J. at 13.) On remand, the ALJ shall consider anew whether Plaintiff's impairments meet or equal a Listing, specifically identifying the Listings she considers and articulating the rationale behind her conclusions.[9] Plaintiff is reminded that he

---

[9] For instance, one relevant Listing may be Listing 1.04, Disorders of the Spine, which includes spinal stenosis, degenerative disc disease, and facet arthritis. 20 C.F.R. Part 404, Subpart P, Appendix 1.

16

bears the burden of proving that his condition meets or equals a listed impairment. *See Maggard*, 167 F.3d at 380.

## II.    The ALJ's Residual Functional Capacity Determination

Plaintiff contends that the ALJ's step five determination, that Plaintiff's impairments do not prevent him from performing any work in the national economy, is unsupported by substantial evidence. (R. 14, Pl's Mot. for Summ. J. at 15.) Specifically, Plaintiff argues that in determining his residual functional capacity, the ALJ improperly discredited the opinion of his treating physician, improperly discredited his subjective complaints of pain, and overlooked important medical evidence regarding his physical impairments.[10]  (R. 14, Pl's Mot. for Summ. J. at 15-16.)

In determining what work an individual can perform, the ALJ must assess the individual's residual functional capacity. As the Seventh Circuit has explained, "[r]esidual functional capacity is that which a claimant can still do despite her physical and mental limitations. . . . The ALJ considers the claimant's ability to lift weight, sit-stand, walk, push-pull, etc., in reaching this determination. . . . The claimant's residual functional capacity is used to determine her ability to engage in various levels of work (sedentary, light, medium, heavy, or very heavy)." *Clifford*, 227 F.3d at 873 (internal citations omitted); *see also* 20 C.F.R. § 404.1545. The ALJ's residual functional capacity assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts." *Briscoe*, 425 F.3d at 352.

_____

[10]  Plaintiff initially argued that the ALJ also erred in failing to adequately consider his mental impairments (R. 14, Pl.'s Memo. in Supp. of Summ. J. at 12-13), but has since withdrawn this argument. (R. 20, Pl.'s Reply in Supp. of Mot. for Summ. J. at 7 n.1.)

Here, the ALJ determined that despite his impairments, Plaintiff retained a residual functional capacity to lift/carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk 6 hours out of an 8-hour workday and sit 6 six hours out of an 8-hour workday with sit-stand option at will; and climb, balance, stoop, crouch, kneel and crawl occasionally. (A.R. at 20.)

## A.    The ALJ's Rejection Of The Treating Physician's Opinion

In making the residual functional capacity determination, the ALJ rejected the opinion of Dr. Simov, Plaintiff's treating physician of more than 13 years. In January 2005, Dr. Simov opined that Plaintiff was not able to sustain physical activity longer than 15-20 minutes; his lifting and carrying were restricted to no more than one to two pounds frequently, and occasionally five pounds; his hand strength was 3/5 bilaterally, and grips bilaterally were weak; he was not able to sit longer than 10 minutes without frequent positional changes; and he was not able to stand or walk longer than 30 minutes. (A.R. at 183.) She further noted that his condition was the same in 2000. (A.R. at 232.)

A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if supported by the medical findings and consistent with substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). The ALJ may discredit a treating physician's opinion if it is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent with other evidence in the record. *Skarbek*, 390 F.3d at 503. In weighing the treating physician's opinion, the ALJ must consider: (1) the frequency of the examination and the length, nature, and extent of the treatment relationship; (2) the evidence in support of the

18

opinion; (3) the opinion's consistency with the record as a whole; and (4) whether the opinion is from a specialist. 20 C.F.R. § 404.1527(d)(2). If the ALJ elects not to give the treating physician's opinion controlling weight, he must "minimally articulate his reasons for crediting or rejecting evidence of disability." *Clifford*, 227 F.3d at 870. Further, "[a]n ALJ may not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record." *Id.*

Here, the ALJ considered Dr. Simov's January 2005 opinion that Plaintiff had advanced disc disease, spinal stenosis, and other ailments, but determined it was entitled to no weight. Although the ALJ's decision is not a model of clarity, she apparently viewed Dr. Simov's January 2005 opinion as based entirely on a December 2004 examination, stating: "This examination, however, was conducted in December 2004; more four years [sic] after the claimant's date last insured and therefore this opinion is given no weight." (A.R. at 20.)

The ALJ's statement demonstrates a misapprehension of the record, since it is apparent that Dr. Simov's opinion was not based *solely* on a December 2004 examination. In her oral report to the SSA, which was given on January 4, 2005, she indicated that December 16, 2004, was the last time she had examined Plaintiff. She further indicated a current diagnosis of advanced disc disease, chronic left sciatica, spinal stenosis, and other ailments. Nothing in her report indicates that these impairments occurred in December 2004; instead it is apparent from the report, as well as the other medical records, that these problems were on-going for several years. (A.R. at 183.) Dr. Simov's records consistently document impairments in Plaintiff's back, shoulder, and right hand as far back as 1994. (A.R. at 190-98, 200-204, 209-210, 219-229.)

The objective testing also indicates that Plaintiff's impairments pre-dated the December 2004 exam, including the 1991 MRI, which revealed disc bulging and mild to moderate osteophytic encroachment upon the L4-5 neural foramina (A.R. at 167), and the 1994 CT scan, which revealed disc bulging and spinal stenosis. (A.R. at 181.) The ALJ did not mention or evaluate any of these findings in reaching her decision, nor did she discuss Dr. Simov's own clinical evaluations (including those made during the 1999-2000 period) which indicated muscle spasms, restricted range of motion, and positive straight leg testing. (A.R. at 220-22.) Although the ALJ is not required to discuss every piece of evidence in the record, *see Ribaudo*, 458 F.3d at 584, her omission of this evidence favorable to Plaintiff is troubling, particularly in light of her blanket assertion that "there are no objective medical records to support [Plaintiff's] claims." (A.R. at 21.)

Dr. Simov also opined that Plaintiff's condition was the same in 2000, but the ALJ rejected this opinion as well, apparently because she believed Dr. Simov was trying to help Plaintiff obtain disability benefits. (A.R. at 20.) The Seventh Circuit has warned of the dangers of treating physicians who "bend over backwards to assist a patient in obtaining benefits," *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006), but there is nothing in the record to indicate that Dr. Simov did anything improper that would impact her credibility, such as giving an exaggerated statement of Plaintiff's symptoms. *See Dixon v. Masssnari*, 270 F.3d 1171, 1177 (7th Cir. 2001). Although Dr. Simov offered an opinion about Plaintiff's disability as of his date of last insured (at the request of Plaintiff's attorney), it appears she was simply trying to fill a gap caused by SSA's own failure to inquire about Plaintiff's limitations during the 2000 period when interviewing Dr. Simov in January 2005. (*See* A.R. at 183.) Further, as stated above, Dr.

Simov's opinion about Plaintiff's medical condition in 2000 finds support in the objective medical tests and the evaluations she conducted during this period. The ALJ did not mention any of this evidence in deciding to reject Dr. Simov's opinion, and her failure to do so "does not provide much assurance that [s]he adequately considered [Plaintiff's] case." *Ribaudo*, 458 F.3d 580; *see also Clifford*, 227 F.3d at 871 (the ALJ may not "select and discuss only that evidence that favors his ultimate conclusion").

The ALJ also concluded that Dr. Simov's opinion was internally inconsistent because she opined that Plaintiff's condition had been the same in 2000, but in 1994 she had opined that Plaintiff's condition was expected to worsen: "Does it mean the claimant has not gotten worse since 2000 which is inconsistent with other evidence including the doctor's own statements from 1994 indicating the claimant will worse [sic]." (A.R. at 20.) Dr. Simov's two statements, made six years apart, are not necessarily conflicting, since it is possible that Plaintiff's condition worsened after 1994 but stayed relatively stable since 2000. It is clear from the record that Plaintiff's condition is degenerative; we do not think Dr. Simov intended to predict the speed or extent to which his condition would worsen over the course of several years. Regardless, to the extent there was any ambiguity in Dr. Simov's opinion about Plaintiff's condition in 2000, the ALJ should have sought additional evidence or clarification from Dr. Simov instead of simply rejecting her opinion outright. *See* 20 C.F.R. § 404.1512(e)(1) (stating that when evidence from a treating physician or other medical source is inadequate to determine disability, the SSA will recontact the source to obtain clarification or additional medical evidence); *Boiles*, 395 F.3d at 426 (observing that "[a]t the very least, the ALJ was obligated to solicit more evidence" before rejecting treating physician's opinion as inconsistent); *Steele*, 290 F.3d at 941 ("[T]he partly

21

adversarial, partly inquisitorial, procedure for adjudicating social security claims requires the ALJ to order additional tests if necessary to render an informed disability determination.").

After discrediting Dr. Simov's opinion, the ALJ made her own evaluation of Plaintiff's residual functional capacity, seemingly without any medical foundation whatsoever. There were no medical opinions in this case about Plaintiff's functional limitations other than that offered by Dr. Simov.[11] Based on the present record, the Court cannot discern how the ALJ reached her determination of Plaintiff's residual functional capacity. It appears that the ALJ may have "played doctor," substituting her own medical judgment for that of a physician, which is not permitted. *Clifford*, 227 F.3d at 870 ("We have likewise insisted that an ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record."); *Lopez*, 336 F.3d at 540 (remanding for further proceedings where ALJ appeared to substitute his own medical judgment for that of medical professionals).

For these reasons, the case must be remanded for further consideration of the medical evidence and, if necessary, clarification from Dr. Simov regarding Plaintiff's limitations as of September 2000. The ALJ should also consider obtaining additional medical evidence, such as

---

[11] In deciding Plaintiff's application for benefits, two state agency physicians completed forms indicating that they had reviewed the medical records and determined Plaintiff was not eligible for benefits. Upon initial determination, Dr. Virgilio Pilapil concluded that "[t]here is insufficient evidence for severity prior to [date last insured]," noting that some of the medical sources identified by Plaintiff had not been able to locate their records. (A.R. at 184.) Upon reconsideration, Dr. Reynaldo Gotanco checked a box indicating that he had reviewed the file and affirmed Dr. Pilapil's determination as written. (A.R. at 185-86.) Neither doctor offered any opinion about Plaintiff's functional limitations.

consultative examinations or testimony from a medical expert,[12] to provide an informed basis for determining Plaintiff's functional limitations.

## B. The ALJ's Credibility Determination

Plaintiff also challenges the ALJ's determination that his subjective complaints of pain were not fully credible. "An ALJ's credibility determinations are given special deference, but the ALJ must still build an accurate and logical bridge between the evidence and the result." *Ribaudo*, 458 F.3d at 584. In making a credibility determination, the ALJ must articulate specific reasons for discounting a claimant's testimony as being less than credible, and may not simply ignore testimony or rely solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding. *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005). Further, when the ALJ's credibility determination rests on "objective factors or fundamental implausibilities rather than subjective considerations (such as a claimant's demeanor), appellate courts have greater freedom to review the ALJ's decision." *Clifford*, 227 F.3d at 872 (citation omitted).

In assessing subjective complaints of pain, the ALJ first must determine whether the pain is substantiated by medical evidence. *Lopez*, 336 F.3d at 539. If the pain is not supported by objective medical evidence, the ALJ must evaluate the effects of the complained-of pain on the individual's ability to work, taking into account the claimant's daily activities; his past work

---

[12] The Court agrees with the Commissioner that use of a medical expert is not mandated by Social Security Rule 83-20, which applies when the ALJ makes a finding of disability but there is a question as to whether the disability arose earlier. *See Scheck*, 357 F.3d at 701; SSR 83-20. Here, Plaintiff was not found to be disabled. As Plaintiff notes, however, the ALJ has discretion to call on a medical expert to assist her in determining the nature and severity of Plaintiff's impairments. *See* 20 C.F.R. § 404.1527(f)(2)(iii).

history and efforts to work; the dosage, effectiveness, and side effects of medication; the nature and intensity of the reported pain; medical evidence from treating physicians and third parties; medical evidence and laboratory findings; and the course of treatment. *Scheck*, 357 F.3d at 703.

Here, the ALJ's credibility determination consists of one sentence: "After considering the evidence of record, I find that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (A.R. at 20.) She does not offer any explanation for this conclusion, and has thus failed to "rationally articulate the grounds for her decision." *Steele*, 290 F.3d at 941.

It appears from language found on the following page of the ALJ's decision that she rejected Plaintiff's testimony about his pain and claimed functional limitations because, in her view, "there are no objective medical records to support these claims." (A.R. at 21.) As discussed above, however, the ALJ did not fully evaluate the medical evidence in the record supporting Plaintiff's complaints of pain, specifically, the 1991 MRI, the 1994 CT scan, and the records from Dr. Simov indicating muscle spasms, restricted range of motion, and positive straight leg testing. (A.R. at 220-22.) Indeed, the record is replete with instances in which Plaintiff reported significant pain symptoms over the course of more than 10 years. The ALJ's failure to adequately evaluate the evidence supporting Plaintiff's complaints of pain warrants remand. *See Ribaudo*, 458 F.3d at 585 (remanding where ALJ failed to assess medical evidence supporting plaintiff's contention that he was in significant pain, including MRI, CT scan, and straight-leg tests); *Lopez*, 336 F.3d at 540 (remanding where ALJ concluded there was no evidence to support Plaintiff's claims without considering medical evidence).

The ALJ also appeared to discredit Plaintiff's complaints of disabling pain because he "sat longer than 10 minutes at the hearing." (A.R. at 21.) The Court is perplexed by the ALJ's observation, because the hearing transcript indicates that shortly after the hearing began Plaintiff requested that he be allowed to get up and walk around due to discomfort, which the ALJ permitted him to do. (A.R. at 252.) While we do not know exactly how much time had passed when Plaintiff made this request, it could not have been much more than 10 minutes, since the entire hearing lasted only 27 minutes, and the testimony regarding Plaintiff's request to stand appears on page 9 of a 26 page transcript. (*Id.*) Additionally, Plaintiff's ability to sit during the hearing would not impact the other limitations he described in his testimony (and evidenced by the medical records) with respect to standing, crawling, bending, reaching, and use of his hands, none of which are discussed or evaluated by the ALJ. The ALJ also failed to evaluate Plaintiff's daily activities, which suggest very limited functioning, and instead merely restated various portions of his testimony. (A.R. at 21.) The ALJ also appears to have ignored Plaintiff's testimony that he took frequent naps and rests during the day, which, according to the vocational expert, would rule out all of the jobs he identified. (A.R. at 21, 268-69.)

For these reasons, the ALJ's decision to reject Plaintiff's subjective complaints of pain is not supported by substantial evidence. On remand, the ALJ must fully consider and evaluate all the evidence related to Plaintiff's pain, including his daily activities; his past work history and efforts to work; the dosage, effectiveness, and side effects of any medication; the nature and intensity of the reported pain; medical evidence from treating physicians and third parties; medical evidence and laboratory findings; and the course of treatment.

## CONCLUSION

The Commissioner's motion for summary judgment (R. 19) is denied, and Plaintiff's motion for summary judgment (R. 13) is granted. The final decision of the Commissioner denying benefits is reversed and remanded for further proceedings consistent with this opinion. The Clerk of the Court is directed to enter judgment in favor of Plaintiff.

ENTERED:

Ruben Castillo
United States District Judge

Dated: December 7, 2007